Good morning. Good morning. May it please the court, my name is Brent Newell. I would like to reserve 15 minutes of my time for rebuttal. Got it. Under the threat of sanctions, including suspending federal highway funding, the San Joaquin Valley Air Pollution Control District removed the agricultural exemption from the district NSR rules at EPA's suggestion, I want to emphasize that at EPA's suggestion. EPA then approved those exemption-free rules and lifted the sanctions because many new and expanding large confined animal facilities were operating and siting in the San Joaquin Valley. The Association of Irritated Residents brought three citizen suits to enforce the district NSR rules because those facilities were not obtaining permits, they were not insuring no net increase in emissions through the purchase of offsets. Air prevailed on summary judgment in the very first of those cases to go to a liability of termination, the Vanderham case. Immediately after the Vanderham case, the EPA claimed it made a mistake and then sought to amend the SIP retroactively. This morning I want to emphasize three points. First, EPA has no authority to amend the SIP. Second, EPA arbitrarily and capriciously exempted minor sources from the offsets requirement because the district sought, and EPA approved, reductions from those sources that are real, permanent, quantifiable, and enforceable. And third, the court should not defer to the opinions of the California Attorney General and the California Air Resources Board. So my first point, EPA has no authority under section 110 K6 to amend the SIP. Congress created this scheme, some call it cooperative federalism, where EPA establishes the air quality standards. The states have the primary responsibility, well, the sole responsibility, of developing the plans and the rules and the regulations to achieve the standards EPA sets. EPA's role under section 110 K is to review that which the state submits. Congress thus limited EPA's role to that of a regulatory backstop. Under section 110 K, EPA has two areas of authority. It can approve or disapprove that which the state submits. EPA could review the existing SIP and make a finding that it is substantially inadequate and then demand the state submits a revision to fix the inadequacy. Here, EPA wanted to amend the SIP itself, and it did so. It promulgated 40 CFR section 52.245 to retroactively go back in time and amend the SIP. Can you tell me why section 7410 K6 doesn't permit them to do that? Well, section – subsection K6 says that EPA can correct an action – I want to emphasize the term action – as appropriate. Now, the term action and the term appropriate refer to EPA's authority within section 110 K. So the actions that EPA is permitted to take are approvals, disapprovals, and what are called SIP calls, those instances where EPA demands a SIP revision that I described. So section 110 K6 should be read within the overall meeting of section 110 K, so that the actions that EPA is allowed to correct are those which Congress gave authority for EPA to do. It's a fundamental principle, Your Honor, of separation of powers that agencies derive their authority from an affirmative grant of power. They do not operate with plenary authority subject only to congressional restriction. Let me see if you're making – or if you can address this argument. When the SIP is approved, let's assume that the California statute was perfectly clear so we don't have to worry about interpretation, and it pretty clearly says we're going to exempt what I'm going to call small farms, which you understand I mean the minor sources. Are you suggesting that the EPA at that point, had they known about that, had they understood it, should have then said, no, no, no, no, we won't approve that. We don't want to have any exemptions at all. Are you saying that or are you just saying that it's a different situation, that the EPA assumed that there were no exemptions? The EPA here didn't assume that there was no exemptions. The EPA knew that at the time the district adopted those NSR rules, that there was a blanket exemption for agricultural equipment. EPA knew that. The Air District knew that. EPA suggested to the Air District, you know what, you better take out everything, notwithstanding the fact that there is a state law in there right now. The motivation for that, clearly based on evidence of the record, was that EPA was trying to assist the district avoid sanctions. Okay. So the district then says, they say what they say, and the EPA, are we saying assumed that it meant no exemptions? Well, then the district NSR rules came into EPA, and while EPA was considering those exemption-free rules, the California legislature passed Senate Bill 700. After that Senate Bill 700 became law, at no time did the district submit anything to EPA to say, hey, you know what, things have changed a little bit. Here, we want you to consider this offsets provision or the one-half exemption. That never happened. EPA went ahead and approved the district NSR rules in 2004, after Senate Bill 700 became law, without any submission by the district. In fact, the district didn't submit any further revision to those district NSR rules until 2008. That submission happened after the Vanderham decision. They started working on their revisions in 2006, but both the district and EPA received notices of intent to sue. Air was required to give them notice of their intent to sue. They knew what the cases were. They were filed. They're matters of public record, but at no time did the district attempt to change these rules until 2008. And I would direct the court to the safe air decision. The safe air decision is rather destructive, because in the situation with Idaho law and banning field burning, consistently Idaho law allowed for field burning. Nevertheless, the state submitted a rule that banned field burning, contrary to Idaho state law. EPA approved that, became part of the SIP, and at no time did the safe air court say, you know what, the state didn't have authority here. They just looked at the SIP and held that federal law controls inconsistent state law. Going back to the 110K6 point is that allowing EPA to take this action would drastically alter this model of cooperative federalism. EPA isn't supposed to have authority to amend the SIPs. I mean, imagine a situation where EPA told Texas, hey, Texas, you know, those affirmative defenses we approved in the SIP 20 years ago, you know, we made a mistake. We're going to go back in time and take them out. In this situation, EPA is collaborating with the state. In that example I'm giving you, Texas would undoubtedly say, no way are you messing with that. You do not have authority to change our SIP. We're the ones who get to tell you what's in the SIP, and you get to decide whether it meets the minimum requirements of the act or not. Are there other cases that interpret 7410K6 the way you would urge us to read it? No court has recognized that EPA has the authority that it claims here. Period. Anybody agree with you? Does anybody agree with us? No court has struck down EPA doing what it has done. A little more positive spin on it. Is there any case that has said that your position is correct, your reading of 7410 is correct? I don't think that there's a specific case addressing Section 110K6, but there have been a number of cases since the 1990 amendments where Congress was very specific about a number of provisions that were added in the 1990 amendments, and EPA has sought discretion and claimed that there's a gap and they needed to fill it under Chevron Step 2. Courts have consistently said, you know what, Congress spoke directly to these points and we want to constrain EPA authority. We do not want EPA to have authority because in the 20 years prior to the 1990 amendments, EPA discretion led to failure to meet our quality standards, and Congress wanted to constrain EPA in order to achieve our quality standards in the 1990 amendments. I mean, look, I'll be the first to admit I don't deal with this statute every day, but, you know, just reading it, whenever the Administrator's actions, approving, disapproving, or promulgating any plan is deemed to be in error, the Administrator may revise such action as appropriate. That seems pretty broad to me. I respectfully disagree because the actions that EPA has been given to take are extremely limited. Congress did not give EPA authority to do anything. I'm talking about approving, disapproving, or promulgating any plan. Right. That seems pretty broad, doesn't it? Well, that's because States give EPA the plans. Well, for whatever reason. I mean, this is pretty broad language, and then it says they can revise it as appropriate. That seems to be a pretty, I don't know, pretty healthy grant of discretion. Well, Congress didn't say they could revise the plans as appropriate. Congress said they could revise their actions approving the plans. Okay? So the actions that EPA is authorized to take in approving the plans are approvals and disapprovals. So Congress, very clearly, Judge Silverman, did not say that EPA can revise plans. It said that the agency can revise its actions. Okay. So could you, excuse me, this is Judge Schroeder, could you just give us, in your view, the classic example of what this section is supposed to be for? What would happen under this section, Judge Schroeder, is that, let's say EPA decides that it made a mistake approving, say, the pesticide element in 1997, which is something that was submitted to EPA to regulate pesticides. And EPA, it later became known that EPA inadvertently omitted a document that made the pesticide element enforceable. EPA would say, you know what, we made a mistake approving that. What we should have done is we should have disapproved it because that document was not submitted to us. So then EPA would change the action from an approval to a disapproval. Changing that action would give California up to 18 months of time to submit a correction under Section 110K. And then EPA, if California did not correct the error, EPA would have authority to impose sanctions. So what Congress is trying to do here, Judge Schroeder, is as a regulatory backstop, EPA decides whether it meets the requirements or not. And if it doesn't, then the State has to correct it or face sanctions. That's how it is supposed to work. In your hypothetical, EPA inadvertently failed to ban XYZ chemical. And you're saying when they discover the mistake, they have to allow XYZ for another 18 months while they go through this process, rather than correct it by saying, whoops, we meant we should have included, we should have had, the State should have had XYZ in there. That's correct. And that's what happened early in the saga of this situation when California's laws exempted agricultural sources from any pollution controls. EPA said, okay, you've got 18 months to fix it. My second point is that assuming EPA has the authority, it acted arbitrarily and capriciously. The plain meaning of the offsets provision says that the district has no authority to if the reductions do not meet the criteria for real, permanent, quantifiable, and enforceable reductions. Now, the court should interpret the meaning of State law and does not refer, or defer, excuse me, defer to EPA's interpretation. In the Safe Air case, the Ninth Circuit interpreted State law in reaching its decision. In the Texas versus EPA case, which we cited in our briefing, the Fifth Circuit did not defer to State law. It interpreted State law. So look- You're talking about the court. I mean the court. Yeah, the Fifth Circuit court. Why would the EPA be arbitrary in relying on the opinion of the Attorney General? Well going to the Attorney General's point, the court should interpret the law. Now, in relying on the Attorney General's opinion- Well I grant you, we're not bound by the Attorney General's opinion, but as the agency is trying to do its thing, why is it arbitrary for it to rely on an opinion of the California Attorney General on what California law permits or doesn't permit? Well there's two reasons why, Judge Silverman. First, the plain meaning of the statute says that there are four criteria to satisfy. Real, permanent, quantifiable, enforceable. The record here demonstrates that those criteria have been satisfied. The district adopted and submitted multiple rules affecting agricultural sources, sent them to EPA. The district sought credit for those reductions in its attainment plans. EPA approved all of the rules and all of the attainment plans. Thus, finding that the reductions were real, permanent, quantifiable, and enforceable. Even in the context of confined animal facilities. My client directly questioned whether those reductions were valid reductions and EPA rejected its arguments. It said, no, we're going to approve this rule and we're going to give credit into the attainment plans for massive VOC reductions. Those criteria have been satisfied. So that's the first reason why it's arbitrary and capricious for EPA to rely on these opinions from the Attorney General. The second reason is that the first Attorney General letter actually says there's no exemption for offsets. All of a sudden, when that letter came in, you can imagine what happened. People went running to the Attorney General and said, we need another letter. And that's what happened. The second letter in 2013 offers a conclusory and factual opinion that is directly contradicted by the evidence I just described in the record. As a matter of fact, there's no evidence that says that reductions are not real, permanent, quantifiable, and enforceable. The California Supreme Court in the Yamaha case articulated a standard for judicial review of situations where agencies are interpreting law in a non-rulemaking context. So that's what the Attorney General was doing and that's what the California Air Resources Board were doing in their letters. They were interpreting law in a non-rulemaking context. And in that context, California Supreme Court applied a standard of review that's very similar to Skidmore deference. That standard of review applies deference on a spectrum depending on various factors. One of the factors is whether the agency is interpreting its own regulations or a statute. There's more deference if it's interpreting its own regulations. Less deference if it's interpreting a statute. Whether there was careful consideration by senior agency officials. Whether the agency has consistently maintained that interpretation. Whether the agency's interpretation occurred contemporaneously with the enactment of the legislation. So applying those Yamaha factors here to the Attorney General's letter, the letter came in 2012-2013, well over five years after the Vanderham decision, ten years after Senate Bill 700. It was not articulated contemporaneously with that legislation. Well afterwards. And it was not even an official decision of the Attorney General. California Attorney General's opinions receive specific numbers and they're published on the Attorney General's website. They're found on Lexis when you search for those Attorney General opinions. These opinions were not official Attorney General opinions. Do not reflect under Yamaha consideration by senior agency officials. So applying Yamaha, the court should give very little deference to these Attorney General opinions. Applying Yamaha to the Air Resources Board letter, the 2008 Air Resources Board letter, again, it came out in 2008, right after the Vanderham decision, which was in 2007. It interprets Senate Bill 700, not CARB's own regulations. Again, less deference because it's not interpreting its own regulations. Also not contemporaneous with SB 700 enactment. Came out five years after SB 700 became law in 2003. And there's no evidence that that letter was considered by the actual decision makers at the Air Resources Board, the board members, the appointed board members. So applying Yamaha to these letters, the court should apply very little deference to these letters. And that's the second reason why EPA acted arbitrarily and capriciously, because it ignored the plain language of the statute. It then went to these agency letters that created an interpretation that has no rational connection to what the statute says. I see you're down past ten minutes, and I know you wanted to reserve some time, so you're welcome to use it now, or? Unless the court has any other questions, I'll reserve the balance. Thank you, Mr. Newell. Thank you. Okay, we've received a letter from the respondents, and I gather you folks have decided how you're going to divvy up your time. Is that right? Okay, first up is Ms. Bott for the EPA. We show you're going to take 18 minutes, is that right? Correct, so when the clock gets down to 12, you'll pass the baton to one of your pals, is that right? Okay. Thank you, Your Honor. Good morning. Simi Bott, Department of Justice for EPA. With me at counsel's table is Jefferson Whaling of EPA. Also seated at counsel's table are counsel for three of the four intervenors, who will introduce themselves as they speak. Okay. Your Honors, EPA made a mistake and corrected it. That correction was appropriate and was reasonably based on interpretations of state law by the state attorney general. As Judge Silverman, you observed, section 110 K6 of the Clean Air Act gives EPA broad authority to revise its actions. Actions are approvals, but revisions need not be. This revision was appropriate, and I think it's important to note here that section 110 K6, while it gives EPA a broad authority, does not give EPA unlimited authority. EPA must act lawfully, reasonably, and in keeping with the goals of the act. This correction fell within those bounds. EPA limited the scope of its approval to correspond to California's ability to actually implement the SIP under state law, in keeping with the goals of cooperative federalism, as Ayer described them. And EPA did so without completely voiding all of the progress that had been made by the previous SIP, in keeping with the goal of reducing air pollution. This is not a case where EPA is imposing its own policy preferences on the state, or writing its own implementation rules. What EPA is concerned about is that when California is required to do something by the SIP, that California actually have the authority to implement those measures under state law. Ayer suggests that the statutory structure requires EPA to issue error corrections only in the forms that EPA could act under 110 K3 or K4. But the statutory structure does not make that plain. Section 110 K6 is a separate section. It is a distinct form. It governs actions not only in K3 and K4 approvals, but also promulgations of plans, which are not in section 110 K at all. And so there's no reason that EPA can't interpret its authority under section 110 K6 to issue a revision that is not in a 110 K3 or K4 form. Nor is there any plain language in section 110 K6 that would require EPA to issue error corrections only in those K3 or K4 forms, while there is plain language requiring EPA to use the same procedures. As to Ayer's point that the 1990 amendments were broadly aimed at constraining EPA's authority, section 110 K6 was actually added in response to a case where a court found that EPA didn't have the inherent authority to correct its mistakes more than merely typographical mistakes. So section 110 K6 was actually added to give EPA more authority. And that's in Petitioner's excerpts of record at 386. Ayer argues for the first time in its reply brief, and briefly here as well, that EPA acted inappropriately by issuing an error correction that was retroactive. That argument has been waived, regardless EPA reasonably interpreted its authority under section 110 K6 to allow it to correct its errors from the time of the error onwards. EPA's error determinations were also reasonable. California had not provided necessary assurances that it could fully implement its SIP because of conflicts between the SIP and state law. EPA has an independent obligation to make sure that these necessary assurances have been provided. EPA failed to recognize the conflicts, and its approval was in error. The standard of review here is deferential. Under OBRA v EPA, a Ninth Circuit case, this court defers to EPA's determinations regarding necessary assurances based on state law. Regardless, EPA didn't interpret state law on its own here, but reasonably relied on interpretations by the State Attorney General. And those are interpretations that Ayer urged EPA to seek in the first place. Once those interpretations came out, it was clear that there were indeed conflicts between state law and the SIP, and those conflicts centered on two provisions in state law, the offset provision and the one-half exemption. And there's no dispute about what the one-half exemption means. As to the offset provision, it is ambiguous, technical, and obscure. And EPA reasonably incorporated the State Attorney General's opinion from her 2013 letter in interpreting that provision. It is true, as Ayer points out, that the 2012 letter, as EPA has acknowledged, is difficult to reconcile with the 2013 letter. But the 2013 letter was specifically addressed to the problem regarding the conflict between the state's authority to regulate minor agricultural sources under SB 700 and the SIP. And EPA reasonably relied on that later, more specific letter. As to the savings clauses, Ayer's final argument, the savings clauses don't undermine EPA's error determination. As the State Attorney General explained, the savings clauses serve a narrow and technical purpose. SB 700 changed the definition of agricultural sources, and the savings clauses serve to save rules that pertain to sources that were not considered agricultural under previous law, but are considered agricultural under SB 700. Because EPA erred and appropriately corrected its error, we ask that this court uphold the error correction and deny the petition. If there are no questions. Ms. Garbus, did Schroeder? I guess not. Ms. Bott, thank you. Thank you. We'll call on Ms. Bellator-Williamson for the Air District. Good morning, Your Honors. May it please the court. Annette Bellator-Williamson, District Counsel for the San Joaquin Valley Unified Air Pollution Control District. Good morning. I have just a couple of points that I want to focus this court's attention on this morning. First of all, I want to emphasize that this case, from a practical real world perspective, is really much ado about nothing. Because any decision from this court will neither benefit nor harm air quality in the San Joaquin Valley. EPA's error correction rule only pertains to a limited six year window of time between June 2004 and June 2010. As demonstrated in the record in 2006, the district amended its NSR rules yet again to conform with the permitting and offset exemptions in SB 700. In May 2010, EPA issued a limited approval and limited disapproval of these rules which became effective on June 10 of 2010. Thus, since June of 2010, the district's amended new source review rules, which expressly include the exemptions for minor ag sources consistent with state law SB 700, have superseded the prior exemption free rules that are the subject of EPA's error correction efforts. EPA's- What does that mean exactly? If we were to rule in their favor, for example, what would happen? What would happen is that now, at this present time, as far as redressability of injuries is concerned, vacating EPA's error correction rule will serve no practical purpose. The most that can happen is that if the district could somehow go back in time and retroactively issue permits for the 2004 to 2010 time period, it would essentially be an idle act because those facilities would be entitled to then turn around and immediately surrender their permits thereafter. And the same is also true for offset credits. Even if, hypothetically, a minor ag source could somehow afford to purchase offset credits without going bankrupt, the current offset exemption means that the minor ag sources would be required to rebank those credits. And so, from an air quality perspective, the status quo would essentially be maintained from this point going forward. There would be no benefit for air quality. I also want to address, just very briefly, petitioner's arguments on pages 16 to 17 of their reply brief and alluded to here, where they state that EPA failed to adequately examine the lack of authority under state law for the district's submittal and that the state somehow failed to demonstrate adequate authority under state law for the district's rules. Petitioner's arguments somehow imply that adequate authority, the adequate authority requirement under state law required by Section 110A2E of the Clean Air Act can somehow be forfeited by estoppel. Of course, it's a well-established principle of law that estoppel cannot be invoked against a government agency acting in its public capacity, at least not in the absence of some type of affirmative misconduct and resulting injury, none of which has occurred here. It's important to recognize that California state law has never allowed for the type of permitting and offsets for the type of minor ag sources at issue here, either before or since the state's adoption of SB 700. The fact that EPA failed to recognize that limitation when it approved the rules didn't have the effect of creating adequate state authority out of thin air. It was, quite plainly, an error, the error that is at issue here. And if Section 110K6 is to have any meaning at all, it is to enable EPA to correct this error. Finally, I just want to address one additional point that petitioners brought up concerning their interpretation of Section 10K6. I want to point out that it allows for error corrections as appropriate without any further submission from the state. And petitioners' arguments, if it's to be believed, would essentially read out this last portion of the statute, that no further submission is required from the state to enable EPA to exercise its error correction authority. If you have no further questions, I would like to defer to my co-counsel. Thank you, Ms. Bellacor-Williams. Thank you. Mr. Bishop, next. Mr. Bishop, I have you down for three and a half minutes. Is that right? What you got? That's right. Okay, good. May it please the Court? My name is Tim Bishop of Foster Farms, and I just want to start with a question, your first question, Judge Silverman, about the breadth of EPA's authority here, and suggest that the Court, to decide this case, does not need to explore the far reaches of EPA's authority under K6. This is an unusual case, unusual circumstances, and it fits right in the very core of the error correction power under K6. EPA's error correction here was appropriate, first, because it exactly addressed the problem, which was a mismatch between the state SIP and the district's power under state law, as interpreted by the Attorney General, and as it appears on the face of the California statute. And it was appropriate, second, because none of the other options that are open to EPA, that is partial or limited or full disapproval of the SIP, or conditional approval, none of those would have achieved that pinpoint result of aligning the SIP with state law. And EPA explained why those other options were not appropriate, including the fact that a full disapproval of the SIP here would have harmed the environment, obviously not something that EPA would want to do. So the Court here doesn't have to, in order to affirm, to embrace any broader view of EPA's discretion under K6. And you can leave for another day the question whether EPA can choose to use error correction if some other remedy under section K, subsection K, is reasonably available. My second point, error doesn't have standing. It doesn't have standing to challenge EPA's rule. It hasn't shown that its member's injury is causally related to EPA's action or that vacating the action would redress the injury. Remember what's at issue here. What's at issue here is a narrow category of minor sources. We're not even talking about all minor sources. We're talking only about those that emit less than half of the level of pollutants that are the threshold for major sources. And in an area like the valley, that is a very, very low threshold. And so EPA concluded in its 2010 action, and it concluded again in September 2014, the final rule that the district submitted in a 28-J letter last week, that the exemption of these minor sources, and I quote here, was consistent with federal NSR requirements and would not interfere with attainment or maintenance of the NAAQS. Would not interfere with attainment or maintenance of the air quality standards. So attaining NAAQS levels in the valley doesn't depend, EPA specifically found, on new source review or on offsets for these few minor sources. And that's a finding that AIR hasn't challenged in its papers, and it means that the minor sources at issue here are irrelevant to air quality standards designed to protect AIR's members. If the petitioner believed otherwise, it should have explained why these minor sources that EPA specifically deems irrelevant to the attainment of NAAQS harm its members, and it hasn't done that. Okay. It looks like your three and a half minutes are up. Thank you very much. Thank you. Mr. Jay, I've got you down for three and a half minutes also. Is that right? Yes, sir. Thank you. Good morning. Good morning. Philip Jay. I represent the small farms that are going to be adversely affected by a decision if the court chooses to follow petitioners. I would like to point out, and I think the court has raised some good questions on this, is that if we take the petitioner's argument, there really is no need for Section 110K6. They have presented such a narrow interpretation, it's hard to fathom any situation where EPA could ever use the section. If you look at Section 110K of the Clean Air Act, it lists the examples of what EPA can do when it deals with a plan. They can approve it, partially approve it. They can disapprove it, partially disapprove it. They can give what they call a conditional approval. The next one on the list is they can do the SIP call, where they tell the state, rewrite the plan because it's defective. And then one of the other elements they can do is they can make corrections. By definition, a correction really is an amendment to the SIP. It can't be anything else. It's going back retroactively and fixing an error that was made in the plan. And then 110K6, as the court has pointed out, gives a lot of discretion in EPA on how to deal with these types of situations. A lot of these arguments that you can only use a SIP revision or a SIP call have been already rejected by at least one court. That's the Alabama Environmental Council case, where petitioners raised the same argument. They claimed you can't use this error correction to amend a SIP. You can only do a SIP call. And the court rejected that notion and said, well, that's pre-1990 amendment law. This is not an unusual situation. I think the court uses an interesting term. It says, use of 110K6 is not an outlier. It's not like some obscure thing that somebody dreamed up. It's in the code. And it's been used by EPA on numerous occasions to go back and retroactively correct errors. So I would hate to see a section like that just basically get written out of the act. As to authority, the Clean Air Act says the state presents an assurance of adequate authority. We're getting in a situation here where the petitioners are saying, well, you have to disregard what the state's saying, disregard what the Attorney General says, even though the state provides an assurance of authority. You also have to disregard what EPA says. If they follow the Attorney General's opinion, they are violating the tenet that they're basically abusing their discretion. I think that puts EPA in an impossible situation. The BCCA Appeals Group case basically says that. It says the state gives assurances, EPA should follow that, it should not have to get into this exercise that we're getting in here today, where we're going to nitpick and analyze every word of the state's assurance and the state Attorney General's opinion. To do that, we might as well not have the section in the Clean Air Act that says the state gives assurances. If the state gives assurances and no one has to give it any deference or follow it in any way, what's the point of having that section in there? And in fact, this circuit has recognized in the Ober case that you defer to EPA on this whole issue of state assurance, and the state assurance is just a general proposition. It's not this type of exercise that we're getting into here. A case within a case where we're going to now argue ad nauseum about what state law says or does not say. Thank you, Mr. Jay. Mr. Newell, back to you. Thank you.  Thank you, Your Honor. With respect to EPA's argument, Ms. Bott made the point that AIR made an argument in its reply brief and said that it was an argument about EPA's authority under 110K6. So I disagree that we've raised a new argument in our reply brief. We briefed Section 110K in our opening and we responded to the relevant answering arguments. Ms. Bott and Mr. Jay for AIR Coalition team both made arguments about deference for when a state provides necessary assurances. You heard that phrase a few times when this side came up and argued. Necessary assurances is something that happens when a state submits a planned EPA for review. Under Section 110A2E of the Act, a state is supposed to show that it has authority to implement the SIP. It's supposed to show that it has adequate resources and personnel to implement the SIP, and it's supposed to provide assurances that it has that authority or personnel and resources. When EPA approved the district NSR rules in 2004, the assurances that were provided to EPA was that we have authority. Again, when I was speaking earlier, nobody questioned what EPA was doing at that time. The district did not submit anything about SB 700 trying to limit what it was doing with offsets or with this one-half exemption. There was no question about necessary assurances. In fact, the action EPA is taking now is not saying, is not an action under 110A2E. It's not a claim that the state did not provide necessary assurances. What EPA is saying is, oh, well, EPA, we should have realized, EPA is saying on its own, three framing this argument, that, well, we made a mistake. We should have realized that California did not have authority. That's turning 110A2E around, because it's the state that's supposed to provide assurances. EPA isn't supposed to go around and hunt and peck and look in state law to find whether the state has authority. It's not supposed to investigate whether a state has resources and personnel. The state's supposed to provide that, and in this case, the state did not provide that. The state was trying to avoid sanctions, and EPA was participating in that effort to help the state. Can you make a Ms. Bellator-Williamson's point about subsequent events have more or less superseded this, and this is kind of an academic exercise at this point? I think she's trying to play off the impact. Is she right that there were subsequent actions taken that superseded these? She is correct that the state ultimately submitted revisions to the district NSR rules, and that the SIP ultimately changed. Our position is that the SIP changed on October 17th, 2014, when EPA took final action to approve these two exemptions we're talking about into the SIP. So there would be a 10-year window when the district NSR rules controlled as a matter of federal law. Let me ask you what I asked her. Suppose we were to rule in your favor, what would that practically mean? What happens? What it would mean is that in this 10-year window, or Ms. Bellatory said 6-year window, either 10-year window or 6-year window, that means the exemption-free rules apply, and they trump inconsistent state law. That is under state fair. Okay, and then what happens? I mean, we can't go back in time, and I mean, what can we do? What would be the effect of this? It means that agricultural sources would have to comply with the SIP as written under the district NSR rules. Back then? Yeah. Okay, but now we're in 2015, so what would happen? Right now, it's 2015. If a new source filed a permit application, that source would have to comply with the revised rules that say... Which are in existence now. Which are in existence now. So our case wouldn't have any effect one way or the other on that? This would not have prospective effect. Of course, the meaning of the SIP would be interpreted by courts going forward if there's any challenges. But I think your question is about the retroactive effect. What would happen during that 6-year window? During the 6-year window, under safe air, the exemption-free district NSR rules would control, and agricultural sources would have to obtain offsets and obtain permits, notwithstanding Senate Bill 700. Does that mean you, with limitations, considerations taken care of, you would then be able to sue people because they didn't comply during this 10-year window? Isn't that the practical effect of our following you? That is. And that's what the court in Vanderham held. The Vanderham court held that under safe air, the SIP controls, as a matter of federal law, and trumps any inconsistent state law. It granted summary judgment to air that said this ag source has to get offsets and get a permit. Given that, we have cases like this, so you have a successful lawsuit, but the court can't issue an injunction going forward because it's unnecessary. So, what does the court do to the small farm that has violated during this period of time a fine, require them to buy credits? What is the court going to do that's going to help the environment? The court would require the facility to install control technology to reduce emissions, so that benefits the environment because there's less air pollution entering the air basin. It would require the source to buy more reductions from another source so that there is an actual net decrease in the air basin, given that addition. So there would be a benefit to the environment. Going forward, Judge Garbus, your question is, what would happen going forward? Well, the SIP now says that the district does not have authority to require offsets unless reductions are real, permanent, quantifiable, and enforceable. That triggering event has already happened, so someone could file a lawsuit against a new source going forward and say, under the SIP now, this condition has been satisfied. You have an obligation to obtain offsets. So either way, going forward or going backwards, agricultural sources have to get offsets because the district NSR rules require it, and they trump inconsistent state law. And going forward, the SIP says they're required if the conditions are satisfied. As I explained earlier, those conditions have been satisfied. FDA has approved reductions as real, permanent, quantifiable, and enforceable. The district sought them. It's about improving air quality. And going to the standing points that Foster Farms makes, it argues that there's no benefit to air quality. What offsets do as a matter of California federal law is ensure that there's no net increase in emissions when new and expanding sources add air pollution to the air basin. They take air pollution from somewhere else, so there's no net increase. With this exemption, what happens is there's an allowance, so more emissions end up in the aggregate in the air basin because the ag sources are exempt from offsetting their emissions. That's the causation. That's the harm. The attorney for Foster Farms made the argument that EPA has found that there is no interference with attainment, and he referenced a 28J letter. His argument about that, about EPA's finding, came in a 28J letter filed yesterday afternoon, and it's a new argument. That argument was not made at all in the answering briefs about EPA finding that there would be no interference with attainment and linking that finding to causation. I want to point out about this that the finding that that rule is referring to actually occurred in 2010, and the citation is 75 Fed Reg 26102, and in EPA's finding, it found that offsets and this one-half exemption would not interfere with attainment because the district's plans did not claim credit for those emissions reductions. Just like I was talking about how they sought credit from EPA and EPA approved credit, well, the district didn't claim credit, so EPA said, look, just because these are being taken out, that doesn't interfere with the attainment demonstration. EPA did not find, and I want to emphasize this, EPA did not find that an exemption for ag sources would not allow an increase in air pollution. EPA did not find that there would be no causation because EPA was exempting air pollution entering the air basin, and that is the harm, that is the causation. Mr. Newell, thank you. Counsel on your side, thank you also. The case just argued is submitted. We'll stand in recess for this morning. Judge Schroeder, we'll see you in the conference room on TV. Thank you, Your Honor. All rise.
judges: Schroeder, Silverman, Garbis